May it please the Court. Charles Rabinowitz for the petitioner, Joseph Petitt. The issue before this Court, and this is under the Hold on a minute. Would you please leave temporarily? Hello? Okay, thank you. This is a case under the Longshore and Harbor Workers' Compensation Act, and the underlying issue before this Court is whether a pay raise, which applies equally to an entire class of workers at a company without regard to any increase in skills, responsibility, or production, represents a merit increase or an increase in general wage levels in the community. A preliminary issue is what is the standard of review before this Court, and is it de novo or is it based on substantial evidence, as the Benefits Review Board held. And the position of the claimant, Petitioner Mr. Petitt, is that when a court reaches a conclusion which has legal effects and it's based on undisputed facts in the record, this is more of a legal question and the review is de novo. I cited a Fifth Circuit case that came out that was issued after the reply in this case. I cited it in a 28J letter, which I think is very, very close on this standard of review question. The name of the case is Beach v. Hercules Drilling Company. It's cited at 691 F. 3rd, 566. It's a Fifth Circuit case that came out about a week after I filed the reply brief. And that case was a Jones Act claim in which the question was whether the individual defendant was acting in the course of employment when he accidentally killed the plaintiff's husband. And the district court found in favor of the plaintiff. And on review, the question was, was it a clearly erroneous standard or was it the de novo standard? And the Court held that since the facts were undisputed as to how the death happened, what we're really looking at is a legal conclusion, was the defendant, the individual defendant, acting in the course of employment. And the Court held this, the legal question, predominated over the factual issue and they held it was de novo review. Sotomayor, assume you're right on that point. Do we owe any deference to the Board in this apparently is an issue of first impression? We don't seem to have any seniority cases. No, no. So do we owe any deference at all to the expert board? No, you don't. The first of all, the Board made a legal, if that's correct, and I think it is the correct analysis, the Board said this is a substantial evidence question and they held that the ALJ had substantial evidence, there was substantial evidence in the record to support the ALJ's decision. Secondly, the Board is not entitled to any deference. I think it's under the Potomac Electric Power case, which is not cited in the briefs. It's a 1980 Supreme Court decision in which they, the Supreme Court held that the director is entitled to some deference in interpreting the act, but not the Board itself. Could we, I think the only real relevant testimony in this case is that of the CEO of Mr. Pettit's subsequent employer, and she says essentially, look, we give this to everybody. We thought, you know, if you're not performing satisfactorily, we get rid of you. If you can perform satisfactorily, you get this. Why shouldn't we read that as essentially saying this is a reward for performing satisfactorily? Well, she said specifically it was not a merit increase, and it applied to everybody. And it really, an employer logically gives a raise to an employee for one of two reasons. Either the employee is becoming more productive and is producing more for the company, or you want to keep the employee, it's important that you keep the employee and the employee stays competitive with the rest of the community as far as employment. So the only logical reason she would give these increases is she doesn't want to lose these employees to competitors in the community. So assume that's true. Why isn't that a merit increase? In other words, you're so good, I don't want to lose you. Well, she's giving it to everybody. A merit increase, it's not for merit. It's not for improved performance. It's not for improved. It's not for increased responsibilities. It's not for doing more on the job. It's for simply being there and doing your regular job that you were doing before. Let me come at this a little differently. The statute says the best measure of your current earning capacity is what you're being paid, but in some cases it may not reflect your current earning capacity. In those cases, the ALJ should adjust it. Is that a matter of discretion or a matter of law? No. The ALJ had to take out the increases in the general wage levels when he's looking ñ when he's comparing the average weekly wage to the subsequent wage level. And, for example, when Mr. Pettit got hurt in September of 2003, he was making $15 an hour at Sauce Brothers. He then tried to continue working at Sauce Brothers and received subsequent wage increases simply because the general wage levels were going up. So his ñ but his average weekly wage is fixed at that $15. No, I understand that, but I'm trying to direct you towards the statutory criterion. The statute says we default, if you will, to what the person is making at the time to establish their current earning capacity. But it may not accurately reflect their current earning capacity. In those cases, the ALJ should consider, at his discretion, to adjust it. How do we measure an abuse of discretion under this circumstance? I don't think this is an abuse of discretion. There's case law that says you have to reduce the subsequent wages by the increase in the general wage levels from the time of the injury. And that's what the ALJ didn't do. Is there any evidence in this record as to what people with similar jobs to Mr. Pettit were paid elsewhere? In other words, part of your argument is that ñ that his ñ his pay was essentially the same pay adjusted upwards. Is there any evidence of what other people were paid? The only evidence in the record is that he got ñ he got some additional increases at Sauce Brothers, but there was no ñ there was no evidence of what people, you know, in Coots Bay were making and other types of jobs similar to this. No, I'm not talking about his ñ his ñ the employment at which he was injured, but the employment to which he went. Is there any evidence about what the wage levels were for assemblers? No, there wasn't. Other than what they were paid at his subsequent employer. No, there wasn't.  Nothing compared to Coots Bay. It's a unique market. The ñ the employer at the time of his ñ at his present employer, Ms. Caudill, said specifically this was not a merit raise that he got. That's on page 56 of the excerpts of record. The ñ the problem with this case is the administrative law judge said, I've got to determine wage earning capacity, and he equated it to Section 10 of the Longshore Act that's used to determine average weekly wage. Now, Section 10, you certainly take into consideration all of the contract raises that you get up until that time. But when you're comparing that with the ñ with what's called the residual wage earning capacity, you have to take out those general wage increases. So to say, well, this is what he was ñ this is what he was making competitively at the time is the wrong analysis. And when the Benefits Review Board said this is a substantial evidence question, it confused it further. And hopefully the briefs were ñ my briefs were clear enough to explain this to the Court, that this needs to get resolved correctly, that this is not an average weekly wage issue, and these were definitely not merit increases. The other thing that's important is that ñ which I mentioned in the brief ñ is that as a smaller percentage of the economy is union and ñ and have union contracts applied to them, situations like seniority raises are becoming more and more common. And they really need to be looked at, the same as union contracts that are just ñ Is it correct that if this provision were in a union contract, that then you would prevail? That's exactly right. If it was a union ñ And if an employer had a written policy providing for these increases that everyone got? The ñ If instead of a union contract, an employer had a written policy that every 4 months or 6 months we give an increase, would that be different from a union contract? I don't think it would be any different from a union contract if it applies to all of the workers. And, in fact, in this case, even though there was no written policy, it was an unwritten policy that the employer had that they had in effect. They could change it at any time, but it was their policy that they used to keep ñ entice the workers and keep them there. All right. Thank you. But I think it's ñ I think it's exactly the same. And a union ñ if this had been a union contract, where Mr. Pettit had been, let's say, a longshoreman, where he got raises, hopefully raises every year or periodically, those are taken ñ those are ñ the ñ that is reduced to the time of ñ those are considered general wage increases, and those are taken out of the residual wage-earning capacity for comparative purposes. Do you ñ do you have any Ninth Circuit case on the union contract issue? The case cited in the brief was the D.C. Circuit Randall case, and it was in a footnote. Is there ñ is there a better authority for that? I'm sure there is an authority in the Ninth Circuit. I didn't think that was a controversial issue. I'm not sure that I cited the Randall case on that, but I know there are ñ Well, let me ask your opponent. Maybe this is not at all a matter of contest. No, it isn't. It shouldn't pay anyway. Well, Judge Hurwitz will ask your opponent who will tell us whether it's a matter of contest. Right. As far as you're concerned, it's not. As far as I'm concerned, it isn't. It's not a ñ it's ñ they're automatically taken out when it's a longshoreman situation, where you have a longshoreman working, gets hurt, goes back to longshore work, but can't do certain jobs and loses hours. We take out those wage increases in comparing his post-injury with his ñ with his average weekly ñ his pre-injury average weekly wage. Thank you. Thank you. Please, the Court. I'm Norman Cole, representing the employer carrier. The measure of permanent partial disability is the difference between the average weekly wage and the earning capacity in the employment that, after the injury, the worker is now capable of doing. It's a market-driven capacity. To start out with a question, Judge Hurwitz. Yeah. If Mr. ñ I apologize. Mr. Pettit. Is it Pettit? Okay. I wasn't trying to pronounce it. If Mr. Pettit belonged to a union and the union had negotiated with his subsequent employer, not with ñ not with South Brothers, but with his subsequent employer quarterly wage increases of exactly the same amount that his employer gave as a matter of policy, would those ñ we would treat those ñ would we treat those as general wage increases and therefore not affecting his ñ his current earning capacity? He probably would if they were intended to reflect a change in the cost of living. The reason why we look back at the ñ Well, no, but I guess ñ He did. The union contract was silent. Let's assume the union ñ the union went and negotiated a contract with the employer and the contract provided for precisely what occurs here. Well ñ The contract ñ would we ñ would we treat these as general wage increases? It would ñ there would have to be some evidence on that subject at the trial level. Let me explain. So if ñ if an employer, a union, through a contracting agreement, says that you are going to get a 2 percent raise or a 3 percent raise, that ñ and that's done to ñ to account for the rising cost of living, then real earning capacity isn't changing. You're just staying in the ñ in the same place you're ñ you're using. So the difficulty with your answer is that normally union contracts, and others may have greater experience with them than I, don't say why this is provided. It's just the deal that gets made. Well ñ In those cases, does ñ does the board look behind them to try to discern the reason, or does it just simply treat these as general wage increases? They tend to treat them as a wage increase that would not affect ñ Would not affect your information. ñadjusted earning capacity, because ñ So in this case, let's assume that Mr. Pettit's subsequent employer says, I hate unions, I don't want them to ñ I don't want them to get their ñ get their dirty feet into my industry, so I'm going to ñ I'm going to give them the ñ the kind of deal a union might have negotiated for them. Why ñ why shouldn't we treat that the same way? Because that's the rate that that job would be worth in that economy with that level of skills and performance. Now, let's suppose that ñ let's suppose I'm a welder and I'm making $20 an hour, and there's a shortage of welders in the community, and other employers may be offering $25 an hour for those services. My employer then decides to give me a raise, $25 an hour, instead of $20 an hour. My skills haven't changed, my performance hasn't changed, but the market has indicated that the wage earning capacity has increased. That wage increase has nothing to do with the cost of living, which is the reason why that adjustment is made and was made in Mr. Pettit's claim. You recall ñ But why do we know that? Well, because in this ñ in Mr. Pettit's claim, if you're speaking of that ñ Yes. When he came ñ when he was hired, he was offered a particular wage that was equal to minimum wage at the time. Minimum wage was going to increase in another 8 days. So the employer said, fine, I'll just give you the net ñ the minimum wage that's going to occur in another 8 years ñ 8 days, we'll start you with that. But to account for inflation, essentially, to ñ to ñ I mean, how do we know that? How do we know that from the record? I don't see anything in the employer's testimony that says we're doing this to account for inflation. No, no, no. I'll explain. The adjustment that was made was not related to Ms. Caudill's testimony, but rather if she was paying him minimum wage when she hired him, we looked at what the minimum wage was at the time he was injured. He had an average weekly wage that was based on his earnings at the time of injury. Therefore, we were trying to find out what his earning capacity was when he went back to work, adjusted to the rate in effect at time of injury. To make that adjustment, his starting wage that he actually received was adjusted to reflect the average ñ the minimum wage that existed at the time of injury. Now, then, when he started receiving increases thereafter, those increases were equally adjusted to the ñ to the old ñ the minimum wage that existed at the time of injury. So if he got a ñ there were some ñ there were some increases that ñ one increase that counsel concedes was a merit increase, 55 cents. It increased his earning capacity. There was a ñ this particular employer offered every employer 50 cents an hour raise in May of 2008, I believe. And that did not change his earning capacity. So here he is receiving actually 50 cents an hour more with everybody else in the company. And heís actually getting an additional 50 cents per quarter to their level of competency or what they did. Meanwhile, heís ñ heís got this adjusted wage that started at a lower level. It doesnít change when he gets an extra 50 cents. It does change when the employer offers him an extra 25 cents per quarter, because that's a reflection of what the market rate is for that job. Well, thatís ñ thatís why ñ thatís why Iím ñ Iím asking ñ I understand your conclusion that thatís a reflection of the market rate. Iím asking you, what is there in this record that allows us to make that conclusion? Well, Ms. Caudill testified that this is paidó Not merit-based, she says. Well, itís ñ itís paid with continued adequate performance. In the absence of that performance, people are let go. And even the claimant petitioner acknowledged that there were people who wereó Isnít it true of everybody alwaysó Pardon me? Isnít it true of everybody always that if theyíre no good, theyíre let go? No, itís not. If you look at a union shop, for example, there may ñ people may have less than adequate performance and be retained on the job. It says in the union contract that people with less than adequate performance will be retained on the job? No. I canít say that for every case. Butó Normally, as a just cause, if theyíre lucky, or it has even less than that. But at the very minimum, if youíre not doing your job properly, you can be fired. Well, should be and will be are two different things. This particular employer says, if youíre not working to my standards, youíre gone. Andó So is that ñ so Iím just ñ again, Iím trying to focus on what the record says as opposed to conclusions. So your position is that because the employer said, if you donít do a good job, Iíll fire you, then the increases must have been merit or market-based as opposed to simply to ñ simply to try to keep up with inflation? Yes. Itís a merit ñ itís a market-based and, to some extent, merit-based increase. She says that if people work for us, they promise them a certain maximum wage they can achieve in a certain time frame. So sheís willing to say ñ the employerís willing to say, your ñ the task you do at a certain moment in time is worth a certain amount to me. Thatís what Iím willing to pay you for that job. Well, but thatís ñ thatís true of every increase, because weíd never look ñ weíd never look behind any increase. No, itís not. Itís not true foró Well, of course itís always true of what the employer is willing to pay you at that particular time. But there wasó That would be true of the union wage increase, too. They would have agreed in advance that Iím willing to pay you at this particular time. But there was a cost-of-living increase separate from these quarterly increases that the employer offered. When he started, the most he could earn, the amount that he would eventually receive, was $13 an hour. So I would understand your position. Your position is that because he got a specific cost-of-living increase at one point, these subsequent raises should not be considered cost-of-living increases. Well, theyíre different in character, and theyíre not. And the judge found that they were representative of earning capacity. Thereís evidence to support that through her testimony. You know, as much as Ióbasically what the Benefits Review Board said onóin reviewing this as wellóis that if this is what the economy is providing for that job, thatís what sheís willing to pay. Thatís representative of earning capacity. You canójust because somebodyóIíll take this back. The improvement that you can have in your earning capacity is not wholly dependent on an improvement in skills, although it may be. If you get a new job with a higher rate of pay, thatís certainly representative of an increase in earning capacity. But thatís not the only reason why your earning capacity may increase over the course of time in a job that you perform. It may be a market issue. The market says this job is going to be worth $13 an hour or $13.50 an hour, because she increasedóshe gave a cost-of-living increase to everybody of $0.50 an hour, thereby pulling that cap on that job from $13 to $13.50. Let me ask you a question slightly differently. As I understand itóand I forget that I had initials for the subsequent employer, but letís just call her the subsequent employerópeople doing this job are being paid a wide variety of salaries, correct? Well, everybody starts at minimum wage and has a cap. Right, but they donít all start at the same time. Right. So that somebody whoís been there for the maximum timeó No. No, thatís wrong. If they start, they start at minimum wage. Right. But everybody is subject to the same cap. Soó Again, let me justóI know theyíre all subject to the same path, but if I start on day 1, I get the minimum wage, and then I get subsequent increases. If you start on day 360, I will beówhen you start, Iíll be paid more than you, right? Well, if I started earlier than you and Iím getting the $0.25 per quarter increases, then Iím getting anything. But youíre going to be higher up on the pay scale. But eventually, when I get to $13.00 or $13.50ó Everybodyís paid the same at the end. NobodyóI donít get any more. If you happen to start at $8.50 an hour when I started at $7.95, youíre still going to be capped out at $8.50. I understand the eventual cap. Just stay with my hypothetical for a second. So one person is being paid $8.00 an hour and the other person is being paid $10.00 an hour to do the same job. That may be. Duringóat least during some period along the way. But theyíre different in the terms of their seniority or the amount of time that theyíve been on that job. Okay. Is there any other distinction between them betweenóexcept for the amount of time theyíve spent on the job? In other words, itís theó The boss isnít saying what youíreó Well, afteró The boss isnít saying the person with $10.00 an hour is better at the job than the person at $8.00. Theyíre saying youíve just been here longer. Well, if theyíre still there, apparently theyíre all performing adequately, competently. In the first three, four months or so, they would haveómaybe six months, under this record, there would have been someó Some increase inó Some increase in their productivity. Youíve improved my hypothetical. So get us past that six months. Theyíre all equally skilled. Some are being paid more. After that, theyíre all doing the same thing and some of them may be paid a different amount. But thatís the amount that the market bears. Well, thatís my question. Thatís my question. If thatís the amount that the market bearsóand I was starting a company and I was working in the same town to do the same job, why would I pay them the $10.00 an hour rather than the $8.00? Wouldnítóisnítówouldnít the marketósince people enter and move up to that point, isnít the market really the lower rate rather than the higher rate? No, theótheóitís the higher rate when they get there. Itís the higheróitís whatever the rate is when theyíre there, because it is not a cost-of-living increase. It is not aóit is not an increase that is offered to offset the cost of living, the cost of goods and services that they must pay in order to maintain a simóthe same lifestyle. Well, but if weóif, again, forgive me for interrupting, but this is important to me in this case. If Mr.óletís assume that Mr. Pettitís subsequent employer went away and some new company came in and was starting up the same operation, and we were trying to figure out his earning capacity, why would they offer him what he was making at the previous company when there areówhen people on the market are available at the hypothetically lower rate that the other company starts people at? Well, hypothetically, theyíd have to offer whatever they needed to offer in order to attract the workers they needed. But donít we have an evidence from Mr. Pettitís subsequent employment that all they need to offer is the minimum wage to get them there? Welló And increased by a quarter every so often. The proposal was, weíll start you at minimum wage and we give youóand they made a promise that they will giveóthat with continued adequate performance, they will get these quarterly raises. There may or may not be cost of living increases. There was one that we know of in this record. Mr. Pettit also received a merit, specifically a merit increase, which did not change the cap. It just accelerated the time when he would get there. But if people are willing to accept that, then thatís what would show. IfóI suppose atóif there was a great need for such people doing this soldering work, an employer may needómay have needed to offer more than that. But to say that theóthat theóthis workerís residual earning capacity is frozen in time at minimum wage for all time is ludicrous, because the minimum wage that he has is frozen in time, because the market is offering him a higher rate of pay on a graduated scale that has nothing to do with the cost of living. It is not an inflationary offset. It is aóit is an amount that is offered for the work that is done, consistent with what that market will allow. And I see my time is up. Thank you, counsel. Thank you. There are just a couple of points Iíd like to make. This is exactlyóthis $0.25 increase every 3 months is exactly like a union contract would be. If Mr. Pettitóexcuse meówas able to continue at Sauce Brothers, but in some type of reduced capacityóletís say he was only able to work 30 hours a week instead of 40 hours a week or overtime that he was working beforeóevery wage increase that he subsequently received at Sauce Brothers would beówould not be included in calculating his loss of wage earning capacity. If he got a raise to a different job, if he became a lead man or a foreman or something of that type, then that additional wage increase would be taken into consideration. But the contract increases that he would have gotten at Sauce Brothers, had he remained there, would have been taken out. So you can compare apples with apples when youíre comparing the residual wage earning capacity to his average weekly wage. The otherótwo other points I just wanted to make is wage increases like this $0.25 per hour wage increase that are designed to keep employees with that company that are not merit increases have to be increases in the general wage levels. Otherwise, itís a gift, I guess. But in this situation, the employer specifically testified this is not a merit increase. And the Court is correct that theóthat Mr. Pettit is no better or no worse than any other employee getting those raise increases. Theyíre all doing an adequate job so that they keep the job, and thatóand they get the wage increases automatically. And thatís exactly what a general wage increaseóa wage increase representing an increase in the general wage levels is. And thatís why it should be taken out. As I indicated, the ALJ never analyzed this issue correctly. He was looking at how do I calculate an average weekly wage? And he even cited Section 10C of the Longshore Act in his decision. And the Benefits Review Board never analyzed this correctly either. They simply said the standard of review is substantial evidence and the ALJ had a basis to do what he did, and never even addressed the issue that he used the wrong statute in evaluating this. And thatís why this issue is important, and thatís why itís important that it be reversed. Thank you, counsel. Thank you. The case is argued and will be submitted. The Court will stand in recess for the day.
judges: Goodwin, Reinhardt, Hurwitz